Case No. 16-1222 Multicultural Media et al. petitioners v. Federal Communications Commission et al. Ms. Gonzale for the petitioners, Ms. Sonja Rayson for the respondents. One second. Let's get everybody seated. All right, Ms. Gonzale, good morning. Good morning. May it please the Court, Caroline Gonzale for petitioners, Multicultural Media, Telecom and Internet Council, and League of United Latin American Citizens. With the Court's permission, I would like to request two minutes for rebuttal. We are here today because the FCC has ignored the needs of millions of Americans for over 11 years, and it has done so in a textbook violation of the Administrative Procedure Act and the tenets of reasoned decision-making. In the wake of Hurricane Katrina over a decade ago, MMTC and others petitioned the agency to take steps to ensure that Americans with limited English proficiency were able to receive life-saving information before, during, and after an emergency. Eleven years later, after repeatedly acknowledging the seriousness of the problem, the agency denied the petition. It did so without providing a meaningful response and while ignoring important aspects of the problem. At the outset, I'd like to focus on two aspects of the order that highlight the arbitrary and capricious nature of the decision-making process here. First, the agency's arbitrary decision to limit its order to the formal EAS architecture, thereby ignoring several of MMTC's proposals. And second, the agency's representation that the record supports wholly voluntary solutions to the multilingual emergency information issue. The FCC's order at paragraph 31 states that its decision is, quote, limited to EAS content. In the same breath, the agency acknowledged the petitioner's primary concern was non-EAS information, namely the receipt of information in language during and after an emergency. Indeed, the agency itself observed as early as 2007 that our request was broader than the formal EAS framework. At that same time, it committed itself to solving the issue, to undertaking action within six months. In its order, however, the agency arbitrarily and capriciously ignored this issue. It declined to even consider whether the problem could be solved by an exercise of the agency's public interest authority over broadcasters under sections 303, 307, and 309. We submitted that the designated hitter proposal, one of our three main proposals, could have been implemented by leveraging this public interest obligation during the license renewal process. To this day, we have no idea why the FCC failed to consider this important non-EAS aspect of the problem. The APA demands more than that. State Farm and City of Brookings demand more than that. Second, the agency also stated at paragraph 32 of its order, the record supports reliance upon voluntary arrangements. That statement demonstrates a lack of any rational connection between the facts found and the choice made. The FCC has been encouraging the industry to adopt voluntary solutions since this proceeding began. You can find that in their first report and order at JA82. Yet after 11 years and three requests for comment, the record is barren of any additional efforts that have been undertaken between Hurricane Katrina in 2005 and the agency's order in 2016. The state of play is exactly the same now as it was then. It's exactly the same now as it was in 2007 when the agency acknowledged the seriousness of the problem and committed to correcting the problem. And the record simply does not rationally support the agency's conclusion that voluntary efforts can solve this acknowledged problem. Well, go ahead. I was going to ask you, how does that map onto the timeframe for them addressing the issue of auditory disabilities? So the auditory disability issue was addressed in the sixth report and order, and I believe that that was 2015. It was later on, so they did take some time. They did take some time to address that issue as well, Your Honor. But we would submit that neither delay was appropriate or reasonable. Both well-exceeded timelines that this court acknowledged were too long to be reasonable. And I think, you know, the amount of time that was taken here really plays into the APA argument because, you know, we have an 11-year long record where the agency has not once but three times requested information from broadcasters and from states as to how they are going about addressing this problem. And each time, the agencies receive the same response, which is, in essence, that pretty much nothing is going on, that there have been no additional efforts to address multilingual emergency. Has anything been going on in Congress that you're aware of?  The reason I ask is because the statutory hook here is thin, and I understand your point that this would make a lot of sense as a policy matter and that they have to act reasonably. But it's a complicated problem is their basic answer, and they're studying it like government does and looking at it, but it's got a lot of actors involved, a lot of complicated issues, and there's no real statutory mandate that requires them to do much of anything here, I think they would say. And so they're looking at it, and they have authority to do it, but they don't have a mandate to do something like this. So how do you respond to the idea it's a big, complicated problem involving a lot of players, and they're moving slowly but incrementally in studying the problem? And why is that unreasonable? I think it's unreasonable for several reasons, Your Honor. I mean, it's a complicated problem that has existed for over 11 years at this point, and the particular way that the agency has chose to address the problem has been tried three times before. And so I think it's difficult to call that progress, even incremental progress. The solutions we proposed were actually, we would submit not that complicated. Find a way to designate one broadcaster, English language broadcaster in each station, who would essentially step up if multilingual or Spanish emergency information were not available in an area. I personally don't see the incredible complexity of that. The multilingual issue, obviously if this were just Spanish, that's one issue, but in a lot of areas in the country, that's not going to solve your basic problem. Isn't that part of the issue they're trying to deal with, too? Absolutely, Your Honor. And we acknowledge that there's got to be some line drawing here, right? And someone's going to end up on the wrong side of the line. But the problem here is that the agency just threw up its hands and decided to draw no lines at all. I think the amicus brief of Petitioner AAJC is very helpful in this regard. That's an advocacy group that is predominantly comprised of Asian Americans who do not speak Spanish. But even they said, you know, this is a big problem. We would love to see it solved. If the agency wanted to just start with Spanish first, that would be something. We would be okay with that. And then you could see how that worked and perhaps translate lessons learned to the multilingual context. So we do acknowledge that there are complexities there, but the agency didn't deny the petition on the basis of those complexities. The agency denied the petition because it said, well, voluntary solutions could work fine. So I think there's also a Chenery problem there. If the agency itself didn't say, well, this is just too complicated, so we're not going to do it, they said, well, we're just going to look at the EAS aspect of this, and addressing that would force us to change our Part 11 rules, and so we won't do it. And we would submit that that is the very definition of arbitrary and capricious decision making, to receive a request to change the rules, to receive a request that's also broader than that, and then to simply say, well, we'd have to change our two-minute rule. We'd have to change our 15-minute rule. So the petition denied, essentially. On the question of legislation, I think it was last year, the Integrated Public Alert and Warning System Modernization Act actually passed. FEMA, yeah, I am pulling that now. Yes, FEMA with addressing this problem of limited English proficiency. So I guess two questions. One, do you know if FEMA's doing anything? Two, why isn't the lawsuit aimed at FEMA, then, instead of the FCC, both in this sense, but also to the extent the National Weather Service is the originator, someone who's the originator of these messages? I understand, Your Honor. So there is a reason that the lawsuit is not aimed at FEMA, which is that the lawsuit is broader than just the emergency alert system. We do think that it's important that those who do not speak English be able to receive those but there's a separate issue of emergency information during and after an emergency. So, for example, in the wake of Hurricane Katrina, those who spoke Spanish didn't know where to go to find shelter, to find clean water, to obtain food or medical assistance. And that's not an EAS problem. That's a broader problem. We would submit a public interest problem. And as MMTC said on the record, if a broadcast license, if the FCC's public interest obligation and the intended obligations of licensees are to mean anything, surely they have to mean that broadcasters would be willing to open up their airwaves if only for a short period of time to provide that kind of information, not just for those who speak English but for those who do not, at least in these extreme circumstances where the local station that does transmit in language is knocked off the air or where there is no station that meets those qualifications whatsoever. But what is your answer to my question? That is, to the extent we're focusing on the emergency alerts, that as to that aspect, Congress has said FEMA is tasked with solving that problem. How does that impact your argument as to that aspect of the problem? Well, Your Honor, I think, again, it's a Chenery problem because that's not an argument that was raised by the FCC. Certainly it is something that they could address on remand as to whether or not that particular act solves the EAS issue. I'm not sure that it does, to be honest with you. But, again, this court is bound to either uphold or to review the agency's action below on the basis of the reasons given by the agency. And so I think, in that respect, you can't really take into account the IPAWS or FEMA legislation. What's the specific relief you would ask us to direct them to achieve? We're asking for a remand, Your Honor. We're asking for the petition for review to be granted, to remand to the agency to Would we direct them to do some particular aspect of this? I think the court would direct them to address these issues that have been left unaddressed, to at least consider the non-EAS aspects of the petition. And we think that, on this record, the representation that voluntary solutions are sufficient runs directly counter to the evidence before the agency. How they want to address either of those issues, I think they have some flexibility in doing that. They are the expert agency, but they are issues that need to be confronted. And we hope that once the agency does look at those issues squarely, that the result perhaps would change. But under the Administrative Procedure Act, obviously, what we'd be entitled to would be a remand with some instructions to take a hard look at this very important problem that the agency committed to taking a hard look at in 2007. On your statutory argument? Yes, Your Honor. That statutory provision is just, as you know, just the provision that creates the FCC as a statement of purpose. So it doesn't, having a little trouble seeing how the operative language gets you from the language of the statute into they have to provide multilingual emergency alert system. Can you address that? Sure. Two points on that, Your Honor. One procedural and one substantive. First is the procedural point that the agency didn't even address its Section 1 obligations in the first instance. And so I think this is another case where it might make sense to state plainly that that is an APA violation, that they need to address it on remand, deal with the issue that way. But second on the substantive issue, the anti-discrimination language in Section 1 does mirror the anti-discrimination language in statutes like Title 6, Title 7, the Americans with Disabilities Act. And so even though it's embedded within what we openly acknowledge is a policy statement, we do think that that provision has teeth. Now, we don't think that it expands the agency's jurisdiction, but we do think that it imposes an obligation or a limit on the agency not to discriminate. Now, how they want to go about addressing this issue such that their actions are not discriminatory on the basis of national origin, again, the agency, we believe, would have some flexibility on that front. But based on the language of the anti-discrimination provision, we do think that that is operative language, Your Honor. What about our 2010 decision in Comcast? And we said Section 1 was a policy statement. Yes, Your Honor. And we agree with that. And we, in fact, cited Comcast in our jurisdictional. That's all it is. Well, so first of all, Your Honor, Comcast wasn't addressing the anti-discrimination provision here specifically. And second of all, Comcast did also say that despite being a policy provision, the Section 1 can still give contour or perhaps provide limits, shed light on other active provisions of the Act. So here that would be Section 606, which gives the President the authority to implement EAS. And so what we're really saying here is that whatever the agency does to implement its obligations under Section 606, it has to do so in a nondiscriminatory manner. If there are no further questions, I will save the remainder of my time for a vote. All right. Good morning. May it please the Court. My name is Silas Andresen, and I represent the Federal Communications Commission. The issue before this Court is whether the Commission reasonably denied MMTC's three proposals. The first, the designated hitter, they concede now is outside of the EAS framework. But they filed their petition in the Commission's EAS docket, and their proposals were couched as amending the Commission's Part 11 rules, which are about EAS and EAS only. So their proposal had to fall within the confines of EAS. As for their state-based proposal, they're asking the Commission to require that states account for multilingual alerts in their state plans. But to be clear, the FCC has no jurisdiction over the states who originate these alerts. And while we do have jurisdiction over the EAS participants, we reasonably concluded in the order that the role of translation should rest with the alert originator, the authorized government official, and not a private TV or radio station. And as for the LPS and LPM model, we reasonably concluded that shifting the role of translation from an authorized government official to a private broadcaster would raise a host of concerns that could undermine the integrity of EAS. EAS is a highly technical, complex system, and given the Commission's reasonable approach here, the Court should defer to the Commission's conclusion. Are you saying, for example, the designated hitter proposal would be impossible to achieve? So the role of EAS, Your Honor, it was designed to provide notice of an impending emergency. Hurricane is coming. Tornado is coming. The designated hitter proposal contemplates that broadcasters would air emergency programming before, during, and after an emergency. And the EAS system is not designed to serve as a conduit for emergency programming. We discussed that in paragraph 31 of our order. It has a limited role to provide notice so that alerts are sent as quickly as possible to the entire American public within a matter of minutes. It's not designed to provide ongoing programming. Now, if MMTC wants the Commission to consider adopting regulations around emergency programming, they are welcome to file a petition for rulemaking in a separate docket altogether. But it was reasonable for the Commission. How many years would that take, you think? Your Honor, the delay here is unfortunate. If I can give some context for the delay here. So in 2004, the Commission issued a notice of proposed rulemaking in which we sought input about whether EAS was the most effective warning mechanism, and if not, how it could be improved. Then for the next couple of years, EAS was in a period of flux. We weren't sure if we were going to scrap the system, if we were going to make modifications. Then in 2008, FEMA said, we're going to adopt CAP alerts or IP-based alerts. So then that then triggered the FCC to require that each of these 27,000 EAS participants be able to receive CAP alerts. So then that took a couple of years for all of these devices to get into compliance. Then in 2012, FEMA said, we need to keep the legacy EAS system because it has inherent operational benefits. In that, if wireless goes down, if Internet goes down, we have a robust and reliable backup system where the President can transmit emergency alerts through TV and radio. So at that point, once FEMA made that decision, MMT's petition was incapable of being granted because the system is a top-down, machine-generated, automated system. And MMT's proposals would require injecting a manual translation into what was always designed to be automated. And when you include manual translations in an automated system, there is a risk of inaccuracy.  In Puerto Rico, my understanding is that the alert originator sends messages in Spanish and English. And we are fine with that. That is great. And Florida does that as well. What if the President had to get a message to Puerto Rico? Is there any mechanism? I know that hasn't happened, and we all hope it doesn't. So the President could designate FEMA to provide a translation, and that would then get disseminated. I know that in Florida, for example, they do have LPS stations which transmit Spanish alerts. So the alert originator creates the alert in English and Spanish, and then the LPS station disseminates the Spanish alert to downstream participants, all of whom are foreign-language broadcasters. So states are free to do that. If they want to set up their state plan to accommodate Spanish or any other language, they are welcome to do that. And states already are doing that. For example, Florida. Minnesota is another good example. Their alert originator issues alerts in four languages, Hmong, Somali, English, and Spanish. So we believe that states are in a position to do this, and states are doing it. To the extent they are not, you have to remember that there is a wide variation with states' needs. There are some states, like West Virginia and Montana, that have less than a 1% LEP population. So it probably doesn't make sense for them to focus on multilingual alerting. There are other states that have large LEP populations, and they are making advancements in this space. And this reporting requirement that we have now mandated requires, for the first time, for each of these 27,000 EAS participants to complete a report that tells us what they're doing in this space, what they plan to do, and we have MMTC points out an argument today, well, we've made this request a couple of times before. That was a request. This is a mandate. And this will then help inform our decision. Well, you said we're not really expecting to get much. We don't expect, and you can tell us you've done nothing. So that was the problem, was part of the problem, is that you have asked for information before, and it turns out folks aren't doing much. And then you said here, even though this is a requirement that you give us the information, we're still not expecting to get much. So we are not expecting to get much from states that have homogenous populations that are not doing multilingual, that don't have the LEP population to justify multilingual alerting. However, we have since learned, again, our order was based on the record that was before us. And because these were simply information requests, there was no obligation to submit this reporting. However, we have since learned that there are states, like Florida and California and Texas and Minnesota, that are doing multilingual alerting. For whatever reason, they did not respond to our inquiry or request. So the commission wasn't aware? Because there were also these meetings, these gatherings of specialists during the study period, and you're telling me that the FCC was not aware prior to this rule what Florida was doing? We were aware of what Florida was doing. That is part of the record. But we believe that this process of examining, maybe for the first time, what the local population needs are will spur states to take action. And perhaps states have not looked carefully into this issue, and not to mention that once we get this reporting information, as we talk about in paragraphs 23 and 27 of our order, the commission may take action as well. What action may the commission take? Well, we could possibly look into this idea of incorporating mandates as part of their state plan. We could possibly look at Florida as sort of the model to follow, where they have designated LPS stations. Why is it that hard? I mean, these states have done it. Is it really that complex an issue? It is a very complex issue, Your Honor, and for a couple of reasons. Those states were able to do it, though, right? Yes, they were. Including four languages in Minnesota, you said? They were. And, again, that's in recognition of the fact that there is this large multilingual population in these states. And if states want to do that, they can. But before you start to... One is telling states that at least if you have a sizable population, you have to do it. Couldn't the commission do that? Well, again, we don't have any authority over the originator, the states themselves. We do have authority, of course, over the EAS participants. But as we talk about in the order, asking the private radio or TV station to insert a translation into what is always intended to be an automated system, it raises concerns. First of all... They're so incompetent they can't do it? There will be a mistake now and then, no doubt. But is that really a reason to throw the whole idea out the window of there's going to be a mistake because humans are going to be involved, and so we're just going to forget about it? Your Honor, that also assumes that there are actual people at these stations to perform the translation. MMTC is contending that translation technology is not sufficiently accurate. So you need an actual live human being. But as we talk about in our order in paragraph 5, many of these stations are entirely unattended. They don't have staff on hand. Either they are completely unmanned and they're just running syndicate or network programming, or they might have staff on hand for a few hours a day. But as we all know, weather-related emergency alerts come in at all hours of the night. And so to expect that there's staff on hand at each of these stations to perform the translations, unfortunately that's not practical. So just to clarify then, in the jurisdictions that you're aware of thus far, where the Spanish or multilingual transmissions occur, do all of those occur because the originator is doing it in dual languages? Yes, Your Honor. Or are there any that you're aware of that's done by the broadcasters themselves? It's by the alert originator. And you have no authority over the alert originators? That's right. That's right. If MMTC wanted to lobby the alert originators, of course they're welcome to do that. But we don't have any jurisdiction over the state entities themselves. I will say that the state emergency management authorities that did submit comments to us, they agreed with the commission that the responsibility for translation should rest with them, with the authorized government entity. And, in fact, every single entity who actually has experience in administering EAS, such as FEMA, National Weather Service, state emergency management authorities, broadcasters, they all rejected MMTC's proposal that this role of translation, if the alert originator doesn't do it, then that should fall to the LPS and LPM station. So there's that as well. Now, if I can turn to one important point I want to make, too, is EAS is a very important backup system in that when everything else falls, wireless goes down, cell phone service, Internet goes down, it's intended to serve as a robust and reliable system where the president can transmit an alert within a matter of minutes to the entire American public. That's exactly their concern, right? I'm sorry? That's exactly their concern, is that this is vital. I mean, I think you have to see, recognize, doesn't dispute how vital and important it is to come up with some mechanism of getting these messages out. As I've read the commission, they're not sort of cold-heartedly saying, no, we're not going to care. We recognize that this is life-and-death information. And when you made the changes to address auditory disabilities, the FCC even said, we're not going to go slow. We're going to go fast here. This is really important. It affects people's lives and safety. And you did it within, I think, four to five years. So why is it one of the problems here, the sort of dramatic disparity in timing here on the FCC, you acknowledge there's a problem that needs to be addressed. You don't dispute that. You acknowledge the severity and importance of the problem. And yet, unlike auditory disabilities, this is going as slow as watching paint dry, it seems like. So, Your Honor, on the issue of auditory disabilities, Congress has spoken on this issue. Congress has mandated that the commission ensure that communication services like EAS are fully accessible to persons with disabilities. And that's through the 21st Century Communications and Video Accessibility Act, which updated accessibility laws dating from the 1980s, requiring that we make sure that communication services are fully accessible to persons with disabilities. Unfortunately, Congress has not made a similar directive toward persons with limited English proficiency. But even putting that aside, the EAS is able to accommodate persons with disabilities in that those who are hearing impaired can see a visual crawl displayed at the bottom of a television screen that they can read, and visual crawls are entirely automated. So it doesn't require injecting manual translations, which would undermine the integrity of EAS. But in contrast, MMTC's proposals require a fundamental altering of how EAS is set up. And so that's the distinction there. But even with respect to persons with disabilities, we noted in the order under review, I believe it's footnote 26, that there are limitations with EAS, even with respect to persons with disabilities. We know that many people who are hearing impaired prefer to see their alerts through American Sign Language. But unfortunately, at this point, Legacy EAS is not able to readily convey messages through American Sign Language. And so even with respect to persons with disabilities, there are limits, because this system is technical, it's automated, it's machine-generated, and FEMA has made this determination that this is the system we have, you know, warts and all. And by the way, that determination was made in the fifth report in order. MMTC did not challenge or even comment on that decision. And so this is the system that we have. But I will also say, even within the system, there are ways to facilitate multilingual alerting. So one we've talked about, if the alert originator includes a translation, it will be disseminated in its entirety by downstream EAS participants. We've also adopted a rule, 47 CFR 11.55C4, encouraging foreign language broadcasters to air translations of the alerts. And the way that it can do that, that stays true to the automated nature of EAS, is that they can take the incoming header codes of the alert, so H-U-R, hurricane, P-G-C, PG county, and they can convert that into a basic visual crawl in Spanish or in Creole or any other language. And that's entirely automated. Or they can air the English translation. So you're saying you can automatically translate these headers into foreign languages with only so many words involved. You can. And that capability exists now? Yes, it does exist. The FCC doesn't require it? I'm sorry? The FCC doesn't require it? We don't require it, but the rule is permissive. It's not mandatory. It says should. So we do certainly encourage it. Another way that they can comply with that rule is that they can air the English translation, and then after the end of message code, someone can get on the air and actually translate the alert into a mic. And because that's after the end of message code, that translation would not get propagated downstream. It would just go directly to their audience. So that's another way they can comply with this rule. TAP is a very important mechanism that we haven't talked about. That's an IP-based alert that allows the alert originator to include multiple translations of the alert. And all EAS devices must, must be able to receive and process TAP alerts. All right, but that doesn't help if, as you said, the Internet goes down, wireless goes down. So TAP can – you're right, Your Honor. If the Internet goes down, that's right. You're right. Another – But this translation of the headers into a foreign language would work. Yes, and another similarly automated nature is text-to-speech software. So EAS participants can take English text and use their software to convert that into a Spanish audio. And so that is a technology that is available right now. And then we also have an entirely separate – But none of that's mandated by the FCC. I'm sorry? None of that's mandated by the FCC. It's not mandated by the FCC. No, you're right. And then we have this separate wireless alerting system. And we've adopted rules mandating that mobile devices must support the transmission of Spanish emergency text messages. So if you're a subscriber and you say, I want to get my emergency alerts through Spanish text, we've adopted rules now requiring that. And given most of us, we have our cell phone tethered to us at all times. We're not necessarily tuning into our radio. So this is a very powerful way for the Spanish-speaking population, which is the largest limited English proficiency population in this country, to get their emergency alerts in Spanish. So taken together, the EAS, we are providing a mechanism for EAS participants to disseminate multilingual alerts. We also denied – while we denied MMTC's proposals, we are still looking to this issue. And that is what this reporting requirement is about. And so next year, when we get this information, we will analyze it. And to the extent that states are telling us, you know, there's obstacles or structural impediments that are preventing us from moving forward, the Commission is open to looking into this issue and seeing how we can help. But before you start tinkering with a highly complex system involving 28,000 EAS participants nationwide, I think it's reasonable for the Commission to say, you know what? We need comprehensive, accurate information about what the landscape looks like first, before we start interfering with this system and potentially messing it up. Because it is a very important backup system, and it needs to be robust and reliable at all times. Can I ask you about the nationwide alert? I know it's been around since the Eisenhower era. You haven't been around that long. I have. And I don't remember ever hearing a nationwide alert. And how – if you know, how is that processed? By wireless, by cab, by TV broadcast? Is it also in other languages, or do you know? So the nationwide alert is the presidential alert. So the president, through FEMA, gets on a mic, issues a message. At that point, the nationwide code is activated, which locks the facilities of all of the EAS participants. So it's sort of a dumb pipe that goes from the president to each of these devices, and they will air that audio immediately. And that goes through EAS. That also goes through FEMA's IPOS server, which is the alert aggregator. And IPOS distributes it through – over the Internet, through cell phones, through National Weather Service radios. So while we've never had a presidential alert, that's the way that it's set up. So whatever the president says is immediately disseminated nationwide. In English only? I'm sorry? In English only? Well, no. The president is welcome to issue a translation if they so choose. We haven't – again, we've never seen one of these before, so we're not sure what the president might do in that instance. But, of course, the FCC has no authority to mandate that the president issue a translation. All right. Your Honor, if there's no further questions, we ask that the commission's order be affirmed. All right. Thank you. Does Ms. Van Zyl have any time left? All right, why don't you take a couple minutes? Thank you, Your Honor. Several points were raised during my colleague's argument that I would like to respond to, the last being that the representation that the FCC is still looking at this. Well, the fact of the matter is that the FCC denied our petition. It closed out this petition. And so to the extent that they're still looking at it, that really wasn't a reason relied on by the agency in its own order. Second, in terms of this idea that because we filed our petition in an EAS docket, that the commission was somehow limited to EAS-only solutions, again, that's not something that was articulated in the order. And, indeed, the agency said essentially the opposite in 2007 in its second report and order when it acknowledged that our request was broader than the formal EAS system and said we're prepared to take action on this within six months. Subsequent discussions also did not raise any concerns about this having been filed in the wrong docket. In addition to that, there actually was a second docket in which the agency could have acted. That was the sort of independent panel that investigated what happened with communications infrastructure more broadly during Hurricane Katrina, docket number 06119. The two dockets were linked for a period of time. Inexplicably, the FCC did not list that docket number in its order. And so I think the record belies that contention. The FCC also contended that, well, there are some states that don't have large multilingual populations. We agree with that. We identified 15 states that would not necessarily need to modify either their EAS systems or to engage in a designated header plan, but there are 35 states that do. And I only heard four mentioned as even having made gestures towards solving the problem. And within those 35 states, that includes 48 markets that aren't being served in terms of just Spanish language information alone. Third, in terms of the idea that, oh, well, you would need people to translate, and we just don't have people to translate here. I think the FCC itself addressed this contention when it said that header codes could automatically be translated. Obviously, there's technology there. But in terms of information during and after an emergency, in 2005, in our original petition, the Spanish Broadcasters Association represented that all or almost all of its 200 stations would be willing to volunteer to translate alerts into Spanish. And so, again, I think that that contention is belied by the record. In terms of the idea that this should be left to alert originators, the FCC contends that they don't have authority over alert originators. We would concede to that. But they do have authority over states and localities that want to use the EAS infrastructure, and they regularly place conditions on those states and localities. The states, of course, could, if they chose to, tell alert originators that they had to furnish translations where reasonable. One of our suggestions was simply that states address this issue in their EAS plans, which would have given states and localities maximum flexibility to decide how they want to act on the issue. Why don't you think the states are doing more on this as of now? Is there information on that in the record? Not much, Your Honor. Not much. I mean, the states that have acted, Florida, for example, represented that their satellite-based system was relatively low cost, that it was simply not that difficult. So it is a bit of a puzzle as to why other states aren't doing this. I mean, we would hope that a mandate or even a nudge might change that, and that's really what we're asking for here. Lastly, I'd like to address my colleague's contention that somehow this wireless emergency alert evolution solves the problem. We would represent that it does not, but we didn't leave that statement on the record below because we had no opportunity to. The agency itself didn't rely on this wireless emergency alert order. And so, again, it's a classic Chenery problem to which we had no ability to respond. We don't think that it solves the issue. But in any event, the agency can't rely on it here given that they didn't rely on it in the order itself. If there are no further questions, we would ask the Court to grant the petition for review and remand to the agency. Thank you, Your Honor. Thank you.
judges: Henderson, Kavanaugh, Millett